**In re SCHWINN BICYCLE CO., et al., Debtors.**

**SCHWINN PLAN COMMITTEE, Plaintiff,**

v.

**TRANSAMERICA INSURANCE FINANCE CORPORATION, Defendant.**

**Bankruptcy Nos. 92 B 22474–22482, 94 A 01618.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Sept. 25, 1996.

---

Howard Feller and Dion W. Hayes of McGuire Woods Battle & Boothe, Richmond, VA, Mark K. Thomas and Terry R. Horwitz–Kass of Katten Muchin & Zavis, Chicago, IL, for Plaintiff.

Debra Lee Allen of Transamerica Insurance, Towson, MD, Thomas R. Hill and John Lipinsky of Rooks Pitts & Poust, Chicago, IL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL OF CASE AGAINST TIFCO

JACK B. SCHMETTERER, Judge.

This Adversary proceeding relates to bankruptcy cases filed by Schwinn Bicycle Co. and various related entities (collectively "Debtor" or "Schwinn") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Its liquidating Plan was confirmed. On October 3, 1994, Plaintiff Schwinn Plan Committee ("Plaintiff" or "Committee") filed the instant Adversary Complaint against a number of defendants, including Defendant Transamerica Insurance Finance Corporation ("Defendant" or "TIFCO"), as it was authorized to do under the confirmed Plan. The Committee alleges as to this Defendant that, within 90 days prior to its filing in bankruptcy, Schwinn made seven payments to TIFCO, totaling $458,876.01, pursuant to terms of two insurance premium financing agreements. The Committee asserts that those payments were preferential transfers and thus recoverable under 11 U.S.C. §§ 547 and 550.

TIFCO contends that the payments in question were not preferential because, under 11 U.S.C. § 547(b)(5), those payments did not give TIFCO a greater recovery than it would have received in a liquidation under Chapter 7 of the Bankruptcy Code. TIFCO also asserts that it was at all times a secured creditor and therefore could not have been preferenced by Schwinn.

A separate trial was held on the issues of whether Schwinn bicycle was insolvent in the 90 days prior to filing its petition for bankruptcy protection and whether defendants would receive more than they would in a Chapter 7 liquidation proceeding. That was proven. Findings of Fact and Conclusions of Law were made and entered on February 8, 1996, *see Schwinn Plan Committee v. AFS Cycle & Co., Ltd., et al. (In re Schwinn Bicycle Co.),* 192 B.R. 477 (N.D.Ill.1996), and

are adopted and incorporated herein by this reference.

Trial was held on the remaining issues related to §§ 547 and 550 and in particular to TIFCO's defenses. That trial followed entry of an order herein on January 16, 1995, denying TIFCO's motion for summary judgment, but designating the undisputed facts as deemed established for trial under Fed. R.Civ.P. 56(d). Pursuant thereto and to the evidence admitted at trial, the following Findings of Fact and Conclusions of Law are now made and entered. For reasons stated herein, the transfers in question here are found not to have been preferential, and judgment will be separately entered in favor of TIFCO.

## FINDINGS OF FACT

### A. Procedural Background

Schwinn Bicycle Co. was a United States corporation engaged in the business of manufacturing bicycles and bicycle components. Prior to its bankruptcy, Schwinn borrowed funds from Defendant TIFCO to finance premiums on various insurance policies held by Schwinn. The nature of those financing arrangements are discussed in further detail herein.

On October 7, 1992, Schwinn and several related entities (collectively "Debtor" or "Schwinn") filed petitions for relief under Chapter 11 of the Bankruptcy Code. An order was entered on June 6, 1994, confirming Schwinn's Plan of Reorganization. The Schwinn Plan Committee was established pursuant to Article IX of the Plan to perform various tasks involving plan implementation. Pursuant to § 9.2 of the Plan and ¶ 34 of the Confirmation Order, the Committee was authorized to prosecute any proceedings which could be brought on behalf of Debtor or

Debtor's estate and to recover any transfers to which Debtor might be entitled under the Bankruptcy Code.

On October 3, 1994, the Committee filed the instant Adversary Complaint against forty-nine pre-petition creditors, including TIFCO, seeking to avoid and recover various alleged preferential transfers under 11 U.S.C. §§ 547(b) and 550. The Committee alleges with respect to this Defendant that Schwinn made seven payments to TIFCO, totaling $458,876.01, pursuant to terms of two insurance premium financing agreements.

### B. Nature of Collateral for Insurance Premium Financing

Insurance premium financing agreements such as the one between Schwinn and TIFCO are commonplace in the insurance industry. Premium financing has been in existence for more than fifty years. Today, it is estimated that more than $10 billion in premiums are financed each year. There are a number of premium finance companies that transact business nationwide, one of which is the Defendant, TIFCO. Premium financing enables a commercial enterprise to prepay its insurance premiums in full at the inception of coverage without having to expend large amounts of cash immediately. In the standard arrangement, the insured pays down roughly 15% to 20% of total premiums due. The remaining balance is advanced by the premium finance company. That advance, coupled with the insured's down payment, fully prepays the insured's premiums.[1] In exchange for the premium loan, the insured executes a finance agreement promising to repay the premium finance company the monies advanced, plus finance charges, in amortized monthly installments.

As collateral for the loan, the insured typically assigns to the premium finance compa-

---

1. Insurance premium financing is nearly always arranged by the insured's insurance agent or "producer." The insurance producer typically solicits premium finance companies for terms of financing, prepares the form premium finance agreement required by the chosen finance company, and submits that agreement and other necessary information to the finance company for approval and funding. In most states, the finance company advances the premiums to the insurance producer, who then remits the proper premiums to each of the insured's insurance carriers. However, effective September 16, 1992, the Illinois statute was amended to require insurance premium finance companies to advance premiums directly to insurance carriers absent written authority of the carrier to pay the producer. 215 ILCS 5/513a9(b)(2) (1992). Illinois is the only state known to require, by statute, written authorization from the carrier prior to funding an insurance producer.

ny all "return" or "unearned" premiums. Although insurance premiums are typically prepaid at the inception of coverage, the insurer "earns" its premiums on a pro rated basis, earning a small portion of its premium for each day it extends coverage to the insured. Thus, on any given day during the term of an insurance policy, there is an unearned premium balance which would have to be refunded or "returned" to the insured upon cancellation of its coverage. On the inception date of coverage, 100% of prepaid premiums are unearned. That balance diminishes with time as the insurer gradually earns its premiums. It is these unearned premiums that the insured assigns to the premium finance company as collateral for its loan.

In addition to granting a security interest in its unearned premiums, the insured also typically gives the premium finance company limited power of attorney to cancel the policy in event of default, after notice, and take possession of its collateral. Notices regarding cancellation are generated and mailed in accordance with applicable state law.[2] In Illinois, premium finance companies must first send written notice of their intent to cancel insurance coverage subject to a finance agreement to the insured. The insured then has ten days after receipt of notice to cure its default. If default is not cured within that ten-day grace period, the finance company may effect cancellation by sending notice of cancellation to the insurer. Coverage is then canceled as if the request for cancellation had been submitted by the insured.[3] *See* 215 ILCS 5/513a11 (1992).

### C. Estimating Unearned Premiums

The amount of unearned premiums is finally determined by the insurance carrier only after actual cancellation of insurance cover-

age. Hence, in order to estimate the value of a premium finance company's collateral (i.e., the value of unearned premiums) on any date during the term of an insurance policy, certain assumptions must be made about the way in which the premium is earned over the term of the insurance contract. The insurance industry typically assumes that premiums are earned on a pro rated basis (i.e., 1/365th of the prepaid premium is earned each day during the term of the insurance contract).

To facilitate calculation of unearned premium balances on any particular date during the term of the insurance contract, it is customary in the insurance business to use a three-part guide called the "Ronoco Wheel." The Ronoco Wheel, similar in use to slide rulers of days gone by, "calculates" a pro rata ratio given a specific inception date of coverage and hypothetical date of cancellation. The total prepaid premium can then be multiplied by that ratio to produce the total unearned premium as of the hypothetical date of cancellation.

### D. Premium Financing Arrangements Between Schwinn and TIFCO

Prior to filing its Chapter 11 petition on October 7, 1992, Schwinn entered into two of the above-described insurance premium finance agreements with TIFCO. Michael E. McNamara ("McNamara"), then Vice–President/Treasurer of Schwinn, executed the first Premium Finance Agreement with TIFCO on or about March 5, 1992 (the "March Finance Agreement"). Terms of that agreement required TIFCO to advance $922,682.00 to various insurance carriers in order to prepay premiums on policies taken out by Schwinn. In exchange, Schwinn agreed to repay funds advanced, plus finance charges, in nine consecutive monthly installments of

---

**2.** Insurance premium financing is a state-regulated business. There are currently 38 states plus the United States Virgin Islands that have statutes governing commercial premium finance transactions. The statutes vary from state to state, but commonly dictate (i) the contents of the premium finance agreements, (ii) notification procedures to be followed by premium finance companies when canceling coverages under their limited powers of attorney, and (iii) procedural requirements for returning unearned premiums upon default.

**3.** For Illinois insureds, TIFCO mails Notice of Intent to Cancel to the insured and producer five days after default. If default is not cured within the ten-day grace period, TIFCO then mails Notice of Cancellation to the insurance carrier, with copies to the insured and producer, showing the effective date of cancellation to be the day after the mailing date of the Notice of Cancellation. Adding weekend days, the entire cancellation process takes approximately 23 days.

$104,827.77 each (totaling $943,499.93), due the first day of each month, beginning April 1, 1992. Schwinn further agreed to assign all unearned premiums to TIFCO and to grant TIFCO limited power of attorney to cancel coverage upon Schwinn's default in payment of the installments due and owing to TIFCO.

On or about July 14, 1992, McNamara executed a second Premium Finance Agreement with TIFCO (the "July Finance Agreement"). Terms of the July Finance Agreement required TIFCO to advance $116,082.00 in premiums on various policies in exchange for nine consecutive monthly installments of $13,188.31 each (totaling $118,694.79), due the first day of each month, beginning August 1, 1992. Schwinn again agreed to assign all unearned premiums to TIFCO and to grant TIFCO limited power of attorney to cancel coverage in the event of default.

Alexander & Alexander, Inc. ("A & A") acted as Schwinn's insurance producer in obtaining the insurance coverage scheduled on the March and July Finance Agreements. A & A arranged the financing by obtaining terms for financing from TIFCO, completing the necessary premium finance agreements, and submitting them with supporting information to TIFCO for approval and funding.

### E. Payment History

On March 26, 1992, pursuant to terms of the March Finance Agreement, TIFCO advanced $922,682.00 to A & A, which, together with Schwinn's down payment of $230,671.00, fully prepaid premiums scheduled in that agreement. An Advice of Financed Premium was mailed on March 13, 1992, to each of the insurance carriers and general agents listed therein, with copies to Schwinn and A & A. TIFCO's records show the pre-petition installments due and owing under the March Finance Agreement to have been received and credited to Schwinn's account as follows:

| Installment Due Date | Amount | Date Received |
| --- | --- | --- |
| 04/01/94 | $104,827.77 | 04/03/92 |
| 05/01/92 | $104,827.77 | 05/04/92 |
| 06/01/92 | $104,827.77 | 06/02/92 |
| 07/01/92 | $104,827.77 | 07/10/92 |
| 08/01/92 | $104,827.77 | 08/10/92 |
| 09/01/92 | $104,827.77 | 09/04/92 |

| Installment Due Date | Amount | Date Received |
| --- | --- | --- |
| 10/01/92 | $104,827.77 | 10/02/92 |
| TOTAL | $733,794.39 | |

On August 7, 1992, pursuant to terms of the July Finance Agreement, TIFCO advanced $116,082.00 to A & A, which, together with Schwinn's down payment of $29,020.00, fully prepaid premiums scheduled in that agreement. An Advice of Financed Premium was mailed on July 17, 1992, to each of the insurance carriers and general agents listed therein, with copies to Schwinn and A & A. TIFCO's records show the pre-petition installments due and owing under the July Finance Agreement to have been received and credited to Schwinn's account as follows:

| Installment Due Date | Amount | Date Received |
| --- | --- | --- |
| 08/01/92 | $13,188.31 | 08/07/92 |
| 09/01/92 | $13,188.31 | 09/04/92 |
| 10/01/92 | $13,188.31 | 10/01/92 |
| TOTAL | $39,564.93 | |

### F. The Alleged Preferential Transfers

On October 7, 1992, Schwinn filed its petition for relief under Chapter 11 of the Bankruptcy Code. Accordingly, seven of the installments paid to TIFCO by Schwinn pursuant to terms of the March and July Finance Agreements fell within 90 days of Schwinn's petition date:

| Date Credited to TIFCO Account | Installment Amount | Finance Agreement |
| --- | --- | --- |
| 07/10/92 | $104,827.77 | March |
| 08/07/92 | 13,188.31 | July |
| 08/10/92 | 104,827.77 | March |
| 09/04/92 | 104,827.77 | March |
| 09/04/92 | 13,188.31 | July |
| 10/01/92 | 13,188.31 | July |
| 10/02/92 | 104,827.77 | March |
| TOTAL | $458,876.01 | |

The foregoing seven payments totaling $458,876.00 comprised transfers by Schwinn of its corporate funds to TIFCO, within 90 days prior to filing bankruptcy, on account of antecedent debts created by the March and July Finance Agreements.

### G. TIFCO's Actual Recovery

As of the date of filing, TIFCO's claim against Schwinn arising out of the March Finance Agreement was $209,655.54, which

was the contract balance then shown on Schwinn's account.[4] The value of TIFCO's collateral (the unearned premium calculated on a pro rata basis as of the bankruptcy petition filing date) using the Ronoco Wheel was $457,881.00 as of the petition date, leaving TIFCO oversecured by $248,225.46. TIFCO filed its Proof of Claim on October 19, 1992, as a secured claim in the amount of $209,655.54.

Using the same analysis, TIFCO's claim against Schwinn arising out of the July Finance Agreement was $79,129.86 as of the petition date.[5] The value of TIFCO's collateral (the unearned premium) was $106,070.00 as of the same date, leaving TIFCO oversecured by $26,940.14. TIFCO filed a second Proof of Claim on October 19, 1992, as a secured claim in the amount of $79,129.86.

Post-petition, the insurance coverage scheduled on the March Finance Agreement remained in place. After filing its bankruptcy petition, Schwinn paid the remaining installments due under the March Finance Agreement ($104,827.77 × 2 payments = $209,655.54). Those sums were credited to Schwinn's account as adequate protection payments.[6] TIFCO subsequently withdrew its Proof of Claim related to the March Agreement in March 1993, as the indebtedness on Schwinn's account had been fully satisfied.

Post-petition, Schwinn further paid three of the installments due under the July Finance Agreement, which were also credited to Schwinn's account as adequate protection payments ($13,188.31 × 3 payments = $39,564.93). Schwinn then canceled all insurance coverage scheduled on the July Finance Agreement. Unearned premiums for the

canceled policies totaled $68,594.00 as of the date of cancellation, $39,569.93 of which was paid to TIFCO on March 24, 1993, to satisfy the then outstanding indebtedness under the July Finance Agreement (three remaining payments of $13,188.31). Accordingly, TIFCO further withdrew its Proof of Claim related to the July Agreement in March 1993. Together, the $39,569.93 advanced as adequate protection and the $39,569.93 recovered upon cancellation fully satisfied TIFCO's $79,129.86 claim arising out of the July Agreement.

## H. TIFCO's Recovery in Hypothetical Liquidation Under 11 U.S.C. § 547(b)(5)

If the alleged preferential transfers had not been made, TIFCO would have been unsecured under both agreements as of the date Schwinn filed its Chapter 11 petition on October 7, 1992. This is because TIFCO's collateral, the unearned premiums, would have continued to have been earned during the 90–day preference period. The collateral would therefore have declined while Schwinn's indebtedness would have been the same.

TIFCO's claim against Schwinn's hypothetical bankruptcy estate in Chapter 7, had the alleged preferential transfers not been made, would have been $628,966.62 as of the petition date.[7] As noted, according to the Ronoco Wheel, the value of TIFCO's collateral under the March Financing Agreement was $457,881.00 as of the petition date. Thus, if Schwinn had not made the payments at issue under the March Financing Agreement, TIFCO would have had, as of the actual petition date, a secured claim of $457,-

---

4. Total sums owed by Schwinn to TIFCO under the March Agreement ($104,827.77 × 9 payments = $943,449.93) less total payments received by TIFCO under the March Agreement ($104,927.77 × 7 payments = $733,794.39).

5. Total sums owed by Schwinn to TIFCO under the July Agreement ($13,188.31 × 9 payments = $118,694.79) less total payments received by TIFCO under the July Agreement ($13,188.31 × 3 payments = $39,364.93).

6. As a fully secured creditor, TIFCO was entitled to receive adequate protection for the Debtor's

use of its collateral, pursuant to § 363(e) of the Code. See TIFCO, Inc. v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.), 67 B.R. 990 (Bankr.D.Ct.1986). Payments made to TIFCO post-petition are not and have not been in dispute in the Adversary case.

7. Total contract balance still owed by Schwinn to TIFCO under the March Agreement ($104,827.77 × 2 payments = $209,655.54) plus total alleged preferential transfers recredited to account ($104,827.77 × 4 payments = $419,311.08).

881.00 and an unsecured claim of $171,085.62 with that Agreement.

Under the July Financing Agreement, again using TIFCO's calculations, TIFCO's claim against Schwinn's hypothetical bankruptcy estate had the contested transfers not been made would have been $118,694.79 as of the petition date.[8] Using the Ronoco Wheel, the value of TIFCO's collateral under the July Agreement was $106,070.00 as of the petition date. Thus, if Schwinn had not made the transfers at issue under the July Financing Agreement as of the petition date, TIFCO would have had a further secured claim pursuant to that Agreement of $106,-070.00 and an unsecured claim of $12,624.79 as of the petition date.

### I. TIFCO Received Payments Equal to or Less than the Amount by Which its Collateral Diminished

TIFCO was always over secured on each of the days immediately preceding the alleged preferential transfers:

1. On July 10, 1992, TIFCO received an installment of $104,827.77 under the March Finance Agreement, immediately prior to which the total outstanding debt due TIFCO was $628,966.62 and the value of TIFCO's collateral was $739,299.

2. On August 7, 1992, TIFCO received an installment of $13,188.31 under the July Finance Agreement, immediately prior to which the total outstanding debt due TIFCO was $118,694.79 and the value of TIFCO's collateral was $130,447.

3. On August 10, 1992, TIFCO received an installment of $104,827.77 under the March Finance Agreement, immediately prior to which the total outstanding debt due TIFCO was $524,138.85 and the value of TIFCO's collateral was $641,264.

4. On September 4, 1992, TIFCO received an installment of $13,188.31 under the July Finance Agreement immediately prior to which the total outstanding debt due TIFCO was $105,506.48 and the value of TIFCO's collateral was $119,274.

5. On September 4, 1992, TIFCO received an installment of $104,827.77 under the March Finance Agreement, immediately prior to which the total outstanding debt due TIFCO was $419,211.08 and the value of TIFCO's collateral was $562,836.

6. On October 1, 1992, TIFCO received an installment of $13,188.31 under the July Finance Agreement, immediately prior to which the total outstanding debt due TIFCO was $92,318.17 and the value of TIFCO's collateral was $108,536.

7. On October 2, 1992, TIFCO received an installment of $104,827.77 under the March Finance Agreement, immediately prior to which the total outstanding debt due TIFCO was $314,483.31 and the value of TIFCO's collateral was $474,028.

On each of the transfer dates in issue, the value of TIFCO's collateral always exceeded the outstanding debt immediately prior to payment of the installment.

### CONCLUSIONS OF LAW

This matter is before the Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the Northern District of Illinois. Subject matter jurisdiction lies under 28 U.S.C. § 1334(b). Venue lies properly under 28 U.S.C. § 1409. This matter constitutes a core proceeding under § 157(b)(2)(B), (C), (F), and (O).

To recover payments as preferential transfers the Committee must establish the elements of a preference set out in § 547(b) of the Code. That provides for avoidance of

... any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

  (A) on or within 90 days before the date of filing the petition; or

  (B) between ninety days and one year before the date of the filing of the petition,

---

8. Total contract balance still owed under the July Agreement ($13,188.31 × 6 payments = $79,-129.86) plus total contested transfers ($13,188.31 × 3 payments = $39,564.93).

if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such a creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the . provisions of this title.

11 U.S.C. § 547(b).

■ Thus payments ("transfers" in bankruptcy jargon) may be avoided if (1) of an interest of the debtor in property; (2) made to or for the benefit of creditors; (3) for or on account of an antecedent debt; (4) while the debtor was insolvent; (5) made within 90 days of the petition date (one year for creditors who qualify as "insiders" at the time of transfer); and (6) which enable those transferees to receive more than they would have received in a Chapter 7 liquidation. 11 U.S.C. § 547(b); *Matter of Smith*, 966 F.2d 1527, 1529 (7th Cir.), *cert. dismissed, Baker & Schultz v. Boyer*, 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992). All six elements must be established in order to avoid a transfer. *Barash v. Public Fin. Corp.*, 658 F.2d 504, 507 (7th Cir.1981). As earlier noted, Schwinn transferred corporate funds to TIFCO within ninety days of bankruptcy, while Schwinn was presumed insolvent, 11 U.S.C. § 547(f), on account of antecedent debts created by the March and July Finance Agreements.

Only the fifth element, whether a creditor received more through the transfer than it would be entitled in a Chapter 7 liquidation, is at issue here. In *Schwinn Plan Committee v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle & Co.)*, 192 B.R. 477 (N.D.Ill.1996), it was found that Schwinn was insolvent at the time of the transfers. Also, there is no question here that the transfers were made within the 90–day preference period of § 547 or

that they were made on account of an antecedent debt.

TIFCO's main argument is that the transfers in question were not preferential because it was a secured creditor at all times, and therefore it could not be preferenced.

### 11 U.S.C. § 547(b)(5) Analysis

■ Under the Bankruptcy Code's preference avoidance provision, § 547(b), a trustee may avoid, and ultimately recover for the benefit of the estate, certain transfers made by a debtor to a creditor within the 90 days prior to its filing in bankruptcy. A transfer will only be avoidable as a preference, however, where payment improved the creditor's position vis-a-vis other similarly-situated creditors.[9] In other words, for there to have been a voidable preference, the questioned transfers must have enabled the transferee-creditor to recover more than it would otherwise have been entitled to had the transfer not been made and had the debtor's estate then been liquidated under Chapter 7 of the Bankruptcy Code.

■ The question whether a given transferee-creditor has been "preferred" under the Bankruptcy Code will turn partly on the nature and extent of that creditor's claim. *See Barash v. Public Fin. Corp.*, 658 F.2d 504, 507–08 (7th Cir.1981); *Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, L.P.)*, 178 B.R. 426, 433 (Bankr.W.D.Texas 1995); *Gray v. A.I. Credit Corp. (In re Paris Indus. Corp.)*, 130 B.R. 1, 3 (Bankr.D.Me. 1991); *In re Zuni*, 6 B.R. 449, 452 (Bankr. D.N.M.1980). A creditor that receives payment attributable to an unsecured claim may well receive a preference, assuming the other elements of § 547(b) are satisfied, because absent such transfer that creditor would only share pro rata with other holders of allowed unsecured claims in a Chapter 7 distribution. 11 U.S.C. § 726(a)(2); *Knopfler v. Schraiber (In re Schraiber)*, 1992 WL 280801 *17 (Bankr.N.D.Ill.1992) (Schmetterer, J.) (and cases cited); *Paris Indus.*, 130 B.R. at 3; *In*

---

9. 11 U.S.C. § 547(b)(5); *Barash*, 658 F.2d at 507. Section 547(b)(5) provides that the trustee may avoid any transfer of an interest of the debtor in property: (5) that enables such creditor to receive more than such creditor would receive

if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title. 11 U.S.C. § 547(b)(5) (1994).

*re El Paso Refinery, L.P.,* 178 B.R. at 433–35.

However, a creditor that receives payment attributable to a secured claim is not usually "preferred" because secured creditors generally receive 100% of the value of their collateral upon distribution in a Chapter 7 case. 11 U.S.C. §§ 506, 724; *Schraiber,* 1992 WL 280801 *17; *Paris Indus.,* 130 B.R. at 3; *In re El Paso Refinery,* 178 B.R. 426, 433 (W.D.Tex.1995). Transfers to a secured creditor within 90 days of bankruptcy do not ordinarily exceed the value of the collateral, and thus do not deplete the debtor's estate or deprive similarly situated creditors of their fair share of the creditor's collateral, because the secured creditor has an identifiable property interest in its collateral or the proceeds derived from the sale of it. *Id.; see also* Douglas G. Baird, *The Elements of Bankruptcy,* p. 174–76 (Rev. ed. 1993). By accepting such payments, the secured creditor has usually realized only the value or part of that value of its collateral at an earlier point than it would have had it waited until the debtor filed a bankruptcy proceeding under Chapter 7 of the Code. TIFCO argues that at all times during the 90–day period preceding bankruptcy it was a secured creditor, and therefore it could not have been preferenced by Schwinn under § 547(b)(5). However, the Committee contends that at the date of the bankruptcy petition TIFCO was unsecured if the payments made to it during the 90–day period are added to TIFCO's indebtedness as of the date of the petition filing.

### Was TIFCO a Fully Secured Creditor?

■ There is no doubt here that TIFCO perfected its security interest claims in the unearned insurance premiums.[10] Only the extent of its secured claims is in dispute. A transfer is only "preferential," and thus recoverable, to the extent the transferee-creditor obtained more than it would have absent such transfer in a hypothetical liquidation. 11 U.S.C. § 550(a); *Levit v. Ingersoll Rand Fin'l Corp.,* 874 F.2d 1186, 1196 (7th Cir.

1989) (*"Deprizio"*) (and legislative history cited); *Schraiber,* 1992 WL 280801 *16. Thus, it must be determined whether the value of assets pledged as collateral equaled or exceeded the value of the creditor's secured claim. If so, the creditor was then fully secured, and thus entitled to 100% of its claim upon liquidation in a Chapter 7 case, and there was no "preference." *See Paris Indus.,* 130 B.R. at 3; *Auto–Train,* 49 B.R. at 610. However, if not, the creditor was undersecured and its claim must be bifurcated into a secured portion and an unsecured portion. 11 U.S.C. § 506(a); *Barash,* 658 F.2d at 507. The under secured creditor will be deemed to hold a secured claim only to the extent of the value of its collateral. *Id.* Any remaining balance will be deemed an unsecured deficiency claim, *id.,* and would thus entitle its holder to share pro rata with other unsecured creditors in a Chapter 7 distribution, 11 U.S.C. § 726(a)(2). Section 547(b)(5) might therefore be satisfied, and TIFCO could in such event have been preferred to the extent it is found to hold an unsecured deficiency claim.

### When Should TIFCO's Status as Secured or Unsecured Creditor be Assessed?

In determining whether TIFCO as a secured creditor would have been undersecured in a hypothetical liquidation, one must start by determining the point in time that its collateral should be valued. Should TIFCO's secured position be assessed as of the date of each transfer or should its security be assessed as of the bankruptcy petition date filing with the transfer payments added to its overall indebtedness?

If TIFCO's secured status is analyzed at the time of each transfer, then TIFCO was secured at each of those times and also when the bankruptcy petition was filed. However, if when the petition was filed the amounts of the transfers were added to TIFCO's overall indebtedness (as if the transfers payments had not been made), then TIFCO was un-

---

**10.** Courts have uniformly treated premium finance companies as secured creditors, with their security interests exempt from the filing requirements of Article 9 of the Uniform Commercial Code. *See, e.g., Id.* at 996 (and cases cited); *Uly-* *Pak, Inc. v. Consolidated Ins. Agency, Inc. (In re Uly–Pak, Inc.),* 101 B.R. 551, 553–54 (Bankr. S.D.Ill.1989); *Nicola v. Northfield Insurance Co. (In re Redfeather Fast Freight, Inc.),* 1 B.R. 446, 450 (Bankr.D.Neb.1979).

dersecured because the value of its collateral would be lower than the debt owed by Schwinn. The Committee suggests that this "add-back" method of collateral valuation is used by most courts for the purposes of § 547(b)(5) and should be used here.

TIFCO responds that the analysis used to assess the secured status of creditors differs according to the character of their collateral and according to whether they were secured at the time of the transfer. TIFCO contends that it was secured throughout the 90–day period and therefore the transfers should not be added to the amount it was owed on the date of the bankruptcy petition. Instead, TIFCO asks, as a secured creditor, that its collateral should be valued as of the date of each transfer payment. Thus, it argues, the transfers could be preferential only if the amount it received in each of the transfers was more than the amount of collateral released from its security interest.

### TIFCO Would Be Unsecured Under Committee's "Add–Back" Method

As noted in the recitation of undisputed facts, TIFCO would have been undersecured under both agreements as of Schwinn's bankruptcy petition date had the alleged preferential transfers not been made. As previously shown, under the March Financing Agreement, TIFCO's claim against Schwinn's hypothetical bankruptcy estate in Chapter 7 would have been $628,966.62 as of the petition date had the seven transfers totaling $458,876.00 not been made. Using the Ronoco Wheel to compute unearned premiums, the value of TIFCO's collateral under the March Financing Agreement would have been $457,881.00 as of the same date. Thus, if Schwinn had not made the payments at issue under the March Financing Agreement, TIFCO would have had as of the petition date a secured claim pursuant to that Agreement of $457,881.00 and an unsecured claim of $171,085.62. *See* 11 U.S.C. § 506(a).

Totaling TIFCO's hypothetical[11] recovery under the March Agreement, TIFCO would have received (1) $314,483.31 (the three non-contested payments), (2) $457,881.00 (the full value of its hypothetical secured claim), and (3) some percentage of its $171,085.62 unsecured deficiency claim. Thus, TIFCO would have recovered $772,364.31 plus X% of its $171,085.62 unsecured claim. Because general unsecured creditors will receive less than 100% of their allowed claims under Schwinn's liquidating Plan, TIFCO would have recovered less in a hypothetical liquidation had the payments in issue here not been made, that is less than the $943,449.93 it actually recovered under the March Financing Agreement.

Under the July Financing Agreement, again as earlier demonstrated, had the three transfers totaling $39,564 not been made, TIFCO's claim against Schwinn's hypothetical bankruptcy estate in Chapter 7 would have been $118,694.79 as of the petition date. The value of TIFCO's collateral as of the same date would have been $106,070.00. Thus, if Schwinn had not made the transfers at issue under the July Financing Agreement, TIFCO would have had a secured claim pursuant to that Agreement of $106,070.00 and an unsecured claim of $12,624.79 as of the petition filing date.

Totaling TIFCO's hypothetical recovery under the July Agreement, TIFCO would have received $106,070.00 (the full value of its hypothetical secured claim) plus X% of its $12,624.79 unsecured deficiency claim. Thus, because unsecured creditors in Schwinn's liquidating Plan will receive less than 100% of their allowed unsecured claims, TIFCO would have received less in a hypothetical liquidation had the transfers not been made than the $118,694.79 it actually recovered under the July Financing Agreement.

To summarize, if TIFCO's secured position is assessed at the time of the bankruptcy petition by adding back the questioned trans-

---

**11.** As noted in the Findings of Facts, TIFCO actually recovered 100% of the sums owed by Schwinn under the March Financing Agreement. Prior to Schwinn's filing bankruptcy, TIFCO received seven of nine payments owed by Schwinn, totaling $733,794.39 ($104,827.77 × 7 pay-

ments). Post-petition, TIFCO recovered the remaining two payments, totaling $209,655.54; as adequate protection payments. Thus, TIFCO fully recovered the $943,449.93 Schwinn owed TIFCO under the March Agreement.

fers to TIFCO's debt, TIFCO would have been undersecured as of the petition date on both claims. Under this analysis, because unsecured creditors will recover less than 100% of their unsecured claims in Schwinn's liquidating Plan, TIFCO actually would have received more through the alleged preferential transfers than it would have recovered in a hypothetical Chapter 7 liquidation.

### *"Add–Back" Found Inapplicable Here*

Collateral is usually valued for purposes of a hypothetical liquidation under § 547(b)(5) as of the date the bankruptcy petition was filed.[12] Case law is sparse, however, on whether the secured status of secured creditors is also reviewed as of the petition date.[13] There is support for the proposition that the § 547(b)(5) analysis differs depending on the character of the collateral and whether the creditor is secured or unsecured at any time during the 90–day period. *See Gilbert v. Gem City Savings Assoc. (In re Hale)*, 15 B.R. 565, 568 (Bankr.S.D.Ohio 1981) ( [a] different rule may be applied when the value of the collateral is less than the creditor's claim); *In re El Paso Refinery, L.P.*, 178 B.R. at 433; *Mazer v. Aetna Finance Company (In re Zuni)*, 6 B.R. 449, 451 (Bankr. D.N.Mex.1980).

Only one decision, *Gray v. A.I. Credit Corporation (In re Paris Industries Corp.)*, 130 B.R. 1, 3 (Bankr.D.Maine 1991), has squarely addressed the question of whether payments made to an insurance finance company should be added to the creditor's indebtedness as of the date of the petition. That opinion found that payments made during the preference period should be added back to the indebtedness at the time of the petition and then should be measured to the amount of collateral (unearned premiums) then available. The reasoning of the *Paris* decision was that payments in the 90–day period should be added back even in the case of an insurance premium finance company, which is secured at all times, because it found such to be the principle followed by other courts when dealing with all creditors secured and unsecured. The opinion in *Paris* said:

> We have considered this issue previously, and restate herein that the date of the petition is controlling. *In re Buyer's Club Markets*, 123 B.R. 895, 897 (Bankr.D.Colo. 1991); *In re EMB Asso., Inc.*, 100 B.R. 629, 632 (Bankr.D.R.I.1989). Other jurisdictions have ruled similarly. *See, e.g., In re Auto–Train Corp.*, 49 B.R. 605, 609–10 (D.C.Cir.1985), *aff'd, Drabkin*, 800 F.2d 1153 (D.C.Cir.1986) (a creditor's security interest in refundable unearned insurance premiums, regularly diminishing, is valued, for purposes of § 547(b)(5) as of filing of bankruptcy petition); *In re Property Leasing & Management, Inc.*, 46 B.R. 903, 912 (Bankr.E.D.Tenn.1985) ("the only relevant question is what the secured status of the claim would have been on the date of petition since that alone would determine the distribution to which [the creditor] would have been entitled in a Chapter 7 liquidation").

The *Paris* decision made one pivotal mistake. That decision confused valuation of the

---

**12.** *Schraiber*, 1992 WL 280801 *16; *Taunt v. Fidelity Bank (In re Royal Golf Prods. Corp.)*, 908 F.2d 91, 95 (6th Cir.1990); *In re Tenna Corp.*, 801 F.2d 819, 822–23 (6th Cir.1986); *First Trust Nat'l Ass'n v. American Nat'l Bank & Trust Co. of Chicago (In re Adventist Living Centers, Inc.)*, 174 B.R. 505, 515 (Bankr.N.D.Ill.1994) (Sonderby, J.); *Union Meeting Partners v. Lincoln Nat'l Life Ins. Co. (In re Union Meeting Partners)*, 163 B.R. 229, 237 n. 2 (Bankr.E.D.Pa.1994); *Paris Indus.*, 130 B.R. at 3 (and cases cited); *In re Alper–Richman Furs, Ltd.*, 147 B.R. 140, 155 (Bankr. N.D.Ill.1992) (Katz, J.); *see also 4 Collier on Bankruptcy*, P 547.08 at 547–41 (15th ed. 1995); Vern Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 *Vand.L.Rev.* 713, 740–41 (1985). Section 547(b)(5) was originally intended to be a codification of the holding first announced in *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936). *See 4 Collier on Bankruptcy* P 547.08 at 547–42 (15th ed. 1995).

**13.** There are not many cases on this point because in very few cases will payments to a secured creditor be challenged. Trustees or debtors in possession do not challenge transfers to creditor who were secured throughout the 90–day period, as is the case here. The only place where such a challenge would be appropriate would be where the collateral value declines rapidly throughout the 90–day period and debtor makes payments to the secured creditor to maintain an equity cushion. In practice, there are few such cases.

collateral and the assessment of the status of the creditor, which are two different things. It confused the event of collateral valuation with assessment of whether the creditor is secured or unsecured.

Analysis of the opinion in the *Matter of Prescott,* 805 F.2d 719 (7th Cir.1986), decision clarifies the proper approach to this issue.

In *Matter of Prescott,* the Seventh Circuit reviewed the analysis undertaken by the Bankruptcy Court for the Western District of Wisconsin and reinstated the bankruptcy judge's judgment. *Id., reinstating* 51 B.R. 751. The *Prescott* bankruptcy judge had decided whether a bank that was fully secured on the date of filing had been preferenced as a result of certain transfers in the 90 days preceding the bankruptcy filing. The bank had a lien against the debtor's inventory and accounts receivable, as well as all credit balances in the debtor's bank accounts, and a certificate of deposit. *Prescott,* 51 B.R. at 753. In the 90 days preceding the debtor's bankruptcy filing, the bank cashed the certificate of deposit and applied it toward the debtor's outstanding balance and also applied balances in the debtor's bank accounts to the outstanding balance. *Prescott,* 51 B.R. at 753–54. Like TIFCO in this case, the bank argued that because it was a secured creditor the transfers were not preferential. The *Prescott* bankruptcy judge's opinion set forth its analysis for determining whether a preference period transfer to a creditor that is secured on the bankruptcy filing date is preferential.

■ The first step was to determine the status of the creditor. *Prescott,* 51 B.R. at 754, *aff'd,* 805 F.2d at 726. *See Krafsur v. Scurlock (In re El Paso Refinery, L.P.),* 178 B.R. 426, 433 (Bankr.W.D.Tex.1995) (the status of the creditor will then determine the analysis to be undertaken to determine if the preference period transfers are indeed preferential). One does not construct a hypothetical status. Rather, the court must look at the actual status of the creditor on the date of filing. In *Prescott,* the bank had argued that, because its claim and the transfers it received were subject to a perfected security interest, it could not have been preferenced. *Prescott,* 51 B.R. at 754. The

*Prescott* bankruptcy judge recognized the rule that fully secured creditors cannot be preferenced. *Prescott,* 51 B.R. at 754–55. However, he held that, in order to apply properly the rule that transfers to a fully secured creditor are exempt from the avoidance provisions of the Bankruptcy Code, the creditor must have been fully secured at the time immediately preceding the initial contested transfer. *Prescott,* 51 B.R. at 755 ("To determine whether a creditor is fully secured, the court looks at the creditor's status immediately before the contested transfers occurred"). More importantly, on appeal the Seventh Circuit held that "to meet his burden [that a secured creditor has been preferenced], the trustee must establish that the value of [the creditor's] collateral on ... the date before the first alleged preferential transfer took place ... was less than the amount owed by [the Debtor] to [the creditor] on that date." *Matter of Prescott,* 805 F.2d at 726. This certainly is an appropriate analysis. A creditor's claim is secured to the extent of its collateral. 11 U.S.C. § 506(a). If a creditor is fully secured, then it follows that a payment to that creditor merely reduces the secured claim, and releases from the security interest the same amount of collateral. Hence, if the creditor is fully secured prior to payment, it cannot be preferenced in having received the payment.

Contrary to the Schwinn Plan Committee's argument, there is nothing in either the Seventh Circuit opinion or the bankruptcy court's opinion to suggest that this rule is limited to the facts of *Prescott.* Both courts analyze the *Prescott* facts in light of the underlying principles concerning the preferential transfers as those affect secured creditors.

Note that *Prescott* did not say that the date immediately preceding the contested transfer is the date for constructing a hypothetical liquidation. The date for constructing the hypothetical liquidation or for valuing collateral for purposes of the hypothetical liquidation was not the issue in *Prescott.* The issue in *Prescott* was how to apply the rule that fully secured creditors cannot be preferenced, which is predicated on the diminution of estate doctrine. *Prescott* clearly

held that the date prior to each contested transfer is the measuring date for determining the status of the creditor, and, if the creditor was fully secured on this date, a subsequent transfer to the fully secured creditor was not preferential. *Prescott,* 51 B.R. at 755, *reinstated* 805 F.2d at 726 ("The measuring date of [the creditor's] status would be before that transfer").

The *Prescott* bankruptcy court applied this analysis to the evidence so as to determine value of·the bank's collateral and debt immediately preceding the contested transfers. On that date, the bank's claim was $172,467.33 and its collateral was $131,734, leaving the bank under secured in the amount of $40,733.33. *Prescott,* 51 B.R. at 755. Hence, having failed to establish that it was fully secured immediately preceding the transfer in issue there, the transfer payment to the secured creditor were not automatically exempt from the avoidance provisions of the Code.

In the case *sub judice,* however, it is clear that TIFCO was fully secured on each date prior to each contested transfer payment.

The second step in the *Prescott* analysis was to assess whether each payment was accompanied by the release of an equivalent value of collateral. The *Prescott* court also recognized that certain transfers to secured creditors could be preferential. *Id.* at 754 n. 1. Following the Bankruptcy Court for the District of New Mexico in *In re Zuni,* the *Prescott* bankruptcy court opinion noted that, "where the value of the collateral does not exceed the amount of the debt and the periodic decrease in this value does not exceed the amount of the payment made," a payment to the secured creditor can be preferential. *Id.* "[T]he more correct formulation would be that payment of a secured claim is not a preference if such payment is accompanied by the release of an equivalent value to the estate." *Zuni,* 6 B.R. at 452.

*Zuni* had involved a secured creditor that had received installments on a note. There, it was held that in not all instances would payment to a secured creditor be exempt from the avoidance provisions of the Code. Rather, the determination of whether a preferential transfer has occurred

... depends on the value of the collateral, the amount of the debt, the amount of the periodic decrease in the value of the collateral, and the amount of payments alleged to be a preference. As long as the combination of these factors do not result in a depletion of the debtor's estate, no preference exists.

*Id.*

Returning to *Prescott,* the bankruptcy court opinion found that the cashing of a certificate of deposit by the bank (for $34,290.12) and application of the debtor's bank accounts (totaling $18,353.59) resulted in the bank improving its position in the 90 days before bankruptcy from an undersecured creditor to a fully secured creditor. The amount of the preference was determined to be $40,733.33, being the unsecured portion of the creditor's claim on the 90th day preceding the bankruptcy filing that was secured on the filing date. Because unsecured claims would not be paid in full, the bank was preferenced. *Prescott,* 51 B.R. at 755.

If this Court undertakes the *Zuni* analysis that was followed by *Prescott,* TIFCO still did not receive a single preferential transfer. As shown in the Findings of Fact, at no time within the 90 days preceding the petition date did TIFCO's claim exceed its collateral value. On each transfer date in issue, the value of TIFCO's collateral always exceeded the outstanding debt immediately prior to payment of the installment. Therefore, the transfers to TIFCO were not preferential.

Continuing with the analysis, "the amount of the periodic decrease in the value of the collateral and the amount of payments alleged to be a preference" are to be compared. *Hale,* 15 B.R. at 567,·*quoting Zuni,* 6 B.R. at 452. Looking first to the March Finance Agreement, on the first transfer date the total collateral value was $739,299. Between this date, i.e., July 10, 1992, and the petition date, TIFCO's security interest was reduced by $419,311.08. During the same period, the value of TIFCO's security interest was reduced by $419,311.08. During the same period, the value of TIFCO's collateral declined by $281,418 ($739,299 on July 10, 1992, and $457,881 on the petition date). At

no point in time did the collateral value fall below the outstanding debt, and therefore TIFCO was not preferenced in having re-. ceived payments on its secured debt.

Similarly, under the July Finance Agreement, the total collateral value on the first transfer date in the 90–day preference period was $130,447. Between this date, i.e., August 7, 1992, and the petition date, TIFCO's security interest was reduced by $39,564.93. During the same period of time, the collateral value declined by $24,377 ($130,477 on August 7, 1992, and $106,070 on the petition date). TIFCO therefore was not preferenced in receiving the pre-petition installments on its secured debt because at no point in time did the collateral value fall below the outstanding debt.

In addition, this Court should consider whether each installment released an equivalent value of collateral. *Prescott,* 51 B.R. at 754 n. 1. Each time an installment is paid on a fully secured debt, a corresponding amount of collateral is released from the security interest, which is theoretically available for bankruptcy distribution to unsecured creditors. *El Paso Refinery,* 178 B.R. at 435; *Hale,* 15 B.R. at 567, *quoting Hawkins,* 11 B.R. at 513 ("to the extent a secured creditor holding valuable collateral receives payment prior to bankruptcy, the amount of the secured claim is proportionately reduced"). The Debtor's debt to TIFCO was fully secured on each of the transfer dates in issue. Hence, each time an installment was paid to TIFCO, whether under the March or July Finance Agreement, a corresponding amount of unearned premium was released and would have been available for distribution to the unsecured creditors had Schwinn canceled the coverage.

### Purposes of § 547 Are Served by the Analysis Here

The purposes for § 547 would not be served if the payments involved here were found preferential. Legislative history of that provision is found in H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–178 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6138:

> The purpose of the preference section is twofold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter "the race of diligence" of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section—that of equality of distribution.

*See also Barash v. Public Fin. Corp.,* 658 F.2d 504, 508 (7th Cir.1981) ("A principal goal of the preference provisions [in section 547] is the assurance of equal distribution among creditors."); 4 *Collier on Bankruptcy,* ¶ 547.01, (15 Ed.1995); *Cf. Countryman, Vanderbilt L.Rev.* at 748 ("Statements in the legislative history also mention preserving the bankruptcy policy of 'equality' of distribution. But, with creditors classified for distribution purposes on the basis of liens and priorities, no bankruptcy policy of 'equality' exists. A policy of preserving classes and of preserving equality within classes does exist however, and the preference concept is designed to preserve this policy.") (footnotes omitted).

■ It is hard to see how the payments to TIFCO ran afoul of these two policies. Those payments were scheduled for months prior to the beginning of the 90–day period.[14]

---

14. The fact that the payments here were scheduled ahead of time possibly gives TIFCO an ordinary course of business defense. TIFCO may also have a new value defense here. It is not surprising that most of the § 547(c) shelters seem to fit transfers to premium finance companies. The shelters were designed by Congress to shield transfers which do not deplete the estate, thereby diminishing the pot available to the other unsecured creditors.

Payments were made at a time when TIFCO was 100% secured. Nothing indicates that the payments were made as part of TIFCO's "race to assets." Furthermore, in the case of premium finance companies, the estate is not being depleted. Schwinn actually received insurance coverage for every day the policy was in place.

The concept that a transfer will not be preferential if there is no diminution to the estate is a holdover of the preference provisions under the Bankruptcy Act. *Bergner v. Bank One, Milwaukee (In re P.A. Bergner & Co. Holding Co.)*, 187 B.R. 964, 973 (E.D.Wis.1995). *See also Countryman*, 38 *Vanderbilt L.Rev.*, at 739 ("In a variety of contexts, the Supreme Court interpreted the preference provisions of earlier Bankruptcy Acts to require that a voidable preference must 'impair' or 'diminish' the bankrupt estate") (citations omitted); *Deel Rent-A-Car, Inc. v. Levine*, 721 F.2d 750, 755–56 (11th Cir.1983) (finding that under both the Code and the Act, avoidance of transfers that do not diminish the bankruptcy estate do not serve the purposes of bankruptcy law). Although the requirement does not explicitly appear in § 547(b), a number of cases interpret the introductory paragraph of § 547(b) to create a diminution of estate requirement. *Matter of Smith*, 966 F.2d 1527, 1536 n. 13 (7th Cir.1992), *cert. dismissed*, 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992); *Bergner & Co.*, 187 B.R. at 973. *See also Abramson v. St. Regis Paper Co. (In re Abramson)*, 715 F.2d 934, 938 (5th Cir.1983) ("There is no statutory requirement that there be a diminution of the estate. However, such a requirement is implicit in the language of the statute ...") (citations omitted); *Harrison v. Brent Towing Co., Inc. (In re H & S Transportation Co., Inc.)*, 110 B.R. 827 (Bankr. M.D.Tenn.1990) ("Depletion of the estate, therefore, remains an essential element to be proven by the trustee in a preference action") *citing Matter of Hartley*, 825 F.2d 1067 (6th Cir.1987); *Buckley v. Jeld–Wen, Inc. (In re Interior Wood Products Co.)*, 986 F.2d 228 (8th Cir.1993).

A very basic assumption under § 547 is that value is transferred out of the estate. Here, however, the estate received value in return for each payment. Every day, Schwinn received coverage. Schwinn could not have had any insurance coverage had it not made the payments the Committee now claims to be preferential. It was established at trial that, had Schwinn been delinquent in any of the preferential payments, TIFCO would have canceled the policy. There was evidence that TIFCO had in place an automatic system which would send a notice of possible cancellation and a cancellation notice out on a set schedule if the regularly scheduled payments were not received. Debtor also had granted TIFCO power of attorney to cancel the insurance coverage in case it ceased making the scheduled payment. Premium finance companies have such measures in place so that they do not become unsecured at any time during the period of a loan by virtue of their inexorably declining collateral. There is no conceivable reason for a premium finance company to allow its collateral to diminish while debtor fell behind in its payments. Undoubtedly, upon the expiration of the cure period required by the applicable state statute, TIFCO's computer would have mailed a Notice of Intent to Cancel. If Schwinn would not have cured the default, a Notice of Cancellation would have been mailed, thereby canceling the insurance coverage.

The hypothetical liquidation analysis required by § 547(b) should not be considered in a vacuum. *Alvarado v. Walsh (In re LCO Enterprises)*, 12 F.3d 938, 944 (9th Cir.1993) ("The phrase 'hypothetical chapter 7' which has been used to describe the 'greater amount' test does not mean that the bankruptcy court can construct its own hypothetical from whole cloth or from only some of the facts"). Further, "[n]either *Palmer Clay* nor *In re Tenna Corp.* prohibit the court from considering the actual facts of the case in ascertaining [the creditor's] classification." *Id.* at 942. Similarly, there is nothing in 11 U.S.C. § 547(b)(5) specifically or in the Bankruptcy Code generally that prohibits the court from considering what actually would have occurred had an alleged preferential transfer not been paid. *Id.* at 942. *See Countryman*, 38 *Vanderbilt L.Rev.* at 741 ("The distribution test always focuses on a Chapter 7 distribution, although sometimes

a hypothetical one. Therefore, the court may have to hypothesize whether the secured creditor or the trustee would liquidate the property prior to Chapter 7 distribution, and the amount the liquidation then would have produced") (citations omitted).

The case of TIFCO is different from the case of an unsecured creditor who receives payments during the 90–day period for the goods it delivered to debtor. In the case of premium finance companies, the estate is not depleted and thus there cannot be preference.[15]

It is clear why, if a premium finance company is always secured, it cannot be preferenced in the 90–day period. At no time would unsecured creditors lose any value in their claims. The premium finance company is only receiving payment as the collateral is diminished. The diminishing of the collateral is allowed by the premium finance company because its indebtedness is also diminished through payments from debtor, thereby maintaining its equity cushion. Where debtor ceases to make payments to the premium finance company, the company has a costless remedy at its disposal, which is to cancel the policy and receive the rest of the debt it is owed by taking it out of unearned premiums. Debtor's estate is in no way being depleted by payments made to a premium insurance company which has a standard financing agreement in place.

Premium finance agreements are different altogether from most other financing arrangements. The above reasoning would not apply to a secured creditor holding a mortgage on real estate which is rapidly losing value during the 90–day period. In that case, if the real estate is rapidly losing value during the 90–day period and debtor makes payments to the secured creditor, those payments may be preferential. Debtor may be merely reducing its indebtedness so that the secured creditor maintains its equity cushion as the collateral declines in value. Thus, creditors that at one time were secured in the 90–day period may still be preferenced.[16] However, the secured creditors are only preferenced if the transfers are larger than the value by which their collateral diminished in the 90–day period.

There are two differences between a secured creditor whose collateral value is rapidly declining and where payments from debtor keep an equity cushion but diminish the estate and the case of insurance premium finance companies. First, in this case Schwinn received something in return for the diminishing of the value of its collateral. TIFCO describes that *quid pro quo* as its relinquishment of its security interest in the collateral. TIFCO actually did not give anything in exchange for the allegedly preferential payments. Of course, TIFCO could have foreclosed, but that forebearance does not really constitute value to the estate. Nonetheless, the estate was not slighted and neither were Schwinn's unsecured creditors. Schwinn received value from insurance coverage which was financed by TIFCO. In fact, Schwinn used up the collateral every day. Here, the collateral did not decline in value by itself, but debtor's acts, receiving insurance, lowered the value of the collateral. Post-petition, adequate protection is provided if debtor's acts lower the value of collateral. Pre-petition, debtors are usually under a contractual obligation not to waste the collateral. Either, way the case of premium financing is clearly distinguishable from the case of a creditor who is secured at the beginning of

---

**15.** The analysis applied here would be inapplicable to a creditor who is unsecured at any time during the 90 day period.

**16.** In several of its earlier briefs, TIFCO argued that, simply because it was a secured creditor at the time of the petition, it could not have received a preferential payment. That is not the case, as collateral may decline in value as payments are being made by the debtor to keep an equity cushion in place. Ginsberg and Martin foresaw the possibility that a fully secured creditor may still be preferenced when they wrote:

If the creditor begins the 90–day period (or one-year period for an insider creditor) fully secured, but the value of the collateral drops below the amount of the loan during that period, and the creditor takes additional collateral to return to its fully secured position, the transfer of the additional collateral is avoidable as a preference.

1 *Ginsberg & Martin On Bankruptcy*, § 8.04[B][2] (4th Ed.1996).

the 90–day period but whose collateral is rapidly declining in value.

The second difference is that the decline in collateral value here is bargained for and expected by both parties in a premium finance transaction. Whereas, in the case of a regular secured creditor, collateral value may decline in unpredictable fashion. In the case of companies like TIFCO, the value of their collateral declines predictably, and remaining value always exceeds the debt due it.

Where collateral rapidly diminishes in value during the 90 days preceding bankruptcy, any payments to a secured creditor may well give that secured creditor an advantage over unsecured creditors. With or without such payments, the creditor's security interest will diminish with the passage of time, and it will recover a smaller proportion of its debt through the bankruptcy process unless advance payments are made that may be reversed as preferences.

As the analysis above explains, the case of the usual secured creditor whose collateral value is rapidly diminishing and the case of premium finance companies are quite different.

### CONCLUSION

TIFCO was at all times a secured creditor of Schwinn. The amounts transferred during the 90–day period were equal to or less than the value by which TIFCO's collateral declined. Since Schwinn's estate was not depleted, there was no preference.

In fact, a finding in favor of the Committee would not undo a preference to TIFCO, but would create a windfall for the Debtor's estate and for the unsecured creditors. In essence, the Debtor would then receive both the benefit of TIFCO's collateral (i.e., the insurance coverage) and repayment of payments made to TIFCO to repay a loan that enabled purchase of the insurance coverage. A finding in favor of the Committee would force TIFCO to disgorge installments received pre-petition, ignoring TIFCO's secured status each time the installments were received, and would compel that at a time when TIFCO no longer has recourse to its collateral because it has been used up by the Debtor. For reasons stated hereinabove, that result is neither warranted nor permitted under the Bankruptcy Code.