An order shall be submitted in accordance with this decision.

In re RBS INDUSTRIES, INC., d/b/a Milford Rivet & Machine Company, Modform, Interlock, Gary Screw & Bolt, Modulus, Debtor.

BORG–WARNER CREDIT CORPORATION, d/b/a Borg-Warner Insurance Finance Corporation, a/k/a BWIFC, Plaintiff,

v.

RBS INDUSTRIES, INC., d/b/a Milford Rivet & Machine Company, Modform, Interlock, Gary Screw & Bolt, Modulus, Defendant.

Bankruptcy No. 5–86–00345.
Adv. No. 5–86–0120.

United States Bankruptcy Court,
D. Connecticut.

Dec. 17, 1986.

Craig I. Lifland, Zeisler & Zeisler, P.C., Bridgeport, Conn., for plaintiff.

William F. Savino, Magavern & Magavern, Buffalo, N.Y., David R. Biondi, Payne, Morehouse, Shafer & Harlow, Fairfield, Conn., for defendant.

Barbara Hadley Katz, DiPietro, Kantrovitz & Brownstein, New Haven, Conn., for Official Unsecured Creditors' Committee.

## MEMORANDUM OF DECISION AND ORDER ON COMPLAINT TO DETERMINE VALIDITY OF SECURITY INTEREST IN UNEARNED INSURANCE PREMIUMS

ALAN H.W. SHIFF, Bankruptcy Judge.

Borg-Warner Insurance Finance Corporation ("BWIFC") seeks a determination that it has a valid, perfected, and enforceable security interest in a $133,919.00 escrow fund, created pursuant to the order of this court in recognition of the fact that unearned premiums from the insurance policies BWIFC financed for RBS Industries, Inc. ("RBS") and claimed by BWIFC to be collateral for such financing, were diminishing on a daily basis. *See* Stipulation ¶¶ 7 and 8, *infra.* The fund was created in an amount agreed upon by the parties to provide adequate protection to BWIFC "should it be determined that BWIFC possesses a valid security interest in unearned

premiums", Stipulation ¶ 8. The controversy here centers on what rights flow from two insurance premium finance agreements ("Finance Agreements") entered into by the parties.

The parties have stipulated and this court finds as follows:[1]

1. On May 16, 1986, RBS filed a voluntary petition seeking the relief afforded by Chapter 11 of Title 11 U.S.C. Sections 1101 *et seq.*, in this Court. In accordance with Sections 1107 and 1108 of the Bankruptcy Code ("Code"), RBS was authorized to continue in possession of its properties, operate and manage its business as a Debtor-in-Possession. No examiner or trustee has been appointed in the Chapter 11 proceedings.

2. BWIFC is a New York corporation with offices located throughout the United States. It is engaged in the business of financing premiums for liability insurance coverage. Prior to the filing of RBS's Chapter 11 petition, BWIFC financed premiums for two (2) separate insurance policies for RBS through its office located in New York City. The financing was arranged through RBS's insurance agent, Fred S. James located in Philadelphia, Pennsylvania.

3. In the matter before the Court, BWIFC financed two (2) insurance policies in the manner described above. On October 3, 1985, prior to RBS's Chapter 11 proceeding, RBS executed an Insurance Premium Finance Agreement ("policy 17042") with BWIFC. This Finance Agreement provided that BWIFC would finance premiums for RBS totalling $554,571.00 after crediting a cash down payment of $157,802. Based upon an annual percentage rate of 9.6 per cent, RBS agreed to pay to BWIFC in nine (9) equal monthly installments the sum of $64,137.00. The total obligation to BWIFC was $578,420, which includes finance charges of $23,841. To secure this indebtedness, RBS granted to BWIFC a security interest in "any and all unearned refund premiums and dividends which may become payable under the policies listed in the schedule and loss payments under said policies, which reduce the unearned premiums ..." This Finance Agreement was accepted by BWIFC on November 22, 1985 and became effective on said date.

4. On December 13, 1985, RBS executed a second Finance Agreement ("policy 17489") with BWIFC. This Finance Agreement provided that BWIFC would finance premiums for RBS totalling $46,200.00, after crediting a cash down payment of $18,870. Based upon an annual percentage rate of 11.9 per cent, RBS agreed to pay to BWIFC in eight (8) equal monthly installments the sum of $6,098.00. The total obligation to BWIFC was $48,784, which includes finance charges of $2,584. Similarly, RBS granted to BWIFC a security interest in the unearned premiums and loss payments payable under the policies, to secure its obligations to BWIFC. This Agreement became effective upon BWIFC's acceptance on January 29, 1986. Both Agreements (policy 17042 and 17489—collectively hereafter referred to as the "Finance Agreements") are attached hereto together with Notices to Insurer and Notices of Acceptance as Appendix "A."

5. The Finance Agreements specifically provide that the loans were made and payable in the State of New York, that the transaction would be governed by the laws of the State of New York, and that the Finance Agreements would not be effective until accepted in writing by BWIFC in the State of New York. (See, Appendix "A" paragraphs 20 and 21 of the Finance Agreements). The Finance Agreements also specifically appoint BWIFC as attorney-in-fact with full authority to, *inter alia*, cancel the policies and receive all sums assigned to BWIFC pursuant to the Finance Agreements. (See, Appendix "A" paragraph 2 of Finance Agreements). BWIFC did not file

---

**1.** Stipulation of the parties filed on October 29, 1986.

a UCC–1 statement reflecting any interest in the unearned premiums.

6. As of May 16, 1986, the Chapter 11 filing date, RBS was indebted to BWIFC in the total amount of $143,568.00, representing the amount due for premiums financed by BWIFC under both policies. Thereafter, on June 23, 1986, BWIFC received an installment from RBS in the amount of $6,098, under policy number 17489. Thus, the amount currently due and owing to BWIFC is $137,470.

7. On June 13, 1986, BWIFC filed a Motion to Compel Adoption or Rejection of Executory Contracts to Furnish Insurance. A hearing was held to consider said Motion on June 27, 1986, wherein the Court directed that RBS either assume or reject the Finance Agreements by September 27, 1986. In addition, because BWIFC complained that its collateral, the unearned premiums, was depreciating on a daily basis, the Court ordered that RBS place in escrow on a weekly basis an agreed upon sum so that by August 28, 1986 the escrow account would have $106,510.00 and from that date forward, the sum of $4,568.16 per week through October 8, 1986, to adequately protect BWIFC's interest. These figures total $133,919, the amount of unearned premiums as of July 10, 1986. In connection with granting this relief, the Court directed BWIFC to file a Complaint to determine the validity and amount of its security interest. Accordingly, on July 1, 1986, BWIFC filed the instant Adversary Proceeding to determine the validity and amount of its secured claim.

8. The Court's directives were designed to adequately protect BWIFC's interest in the unearned premiums, as they existed on July 10, 1986, should it be determined that BWIFC possesses a valid se-

curity interest in unearned premiums. The value of unearned premiums deteriorate daily as the premiums are earned by the carrier with the passage of time. With the agreement of the parties, the Court locked in the value of the unearned premiums as of July 10, 1986, ($133,-919.00) pending a final determination of BWIFC's Complaint to determine the validity and amount of its secured claim.

## DISCUSSION

### I.

### PERFECTED SECURITY INTEREST

■ Although paragraphs 7 and 8 of the Stipulation suggests that there is a question as to whether BWIFC has a security interest in the unearned premiums, it is clear from paragraphs 3 and 4 of the Stipulation and a reading of the Finance Agreements that BWIFC has such an interest. That conclusion is buttressed by a long line of judicial decisions which have held that a security interest can be created in unearned premiums. *See In re Duke Roofing Co.*, 47 B.R. 990, 994 (E.D.Mich.1985); *Premium Financing Specialists, Inc. v. Lindsey*, 11 B.R. 135, 138 (E.D.Ark.1981); *In re Air Vermont, Inc.*, 40 B.R. 335, 337 (Bankr.D.Vt.1984); *In re Auto Train Corp.*, 9 B.R. 159, 164–65 (Bankr.D.D.C. 1981); *In re Krimbel Trucking Co., Inc.*, 3 B.R. 4, 6 (Bankr.W.D.Wash.1979); *Matter of Maplewood Poultry Co.*, 2 B.R. 550, 554 (Bankr.D.Me.1980); *Matter of Redfeather Fast Freight, Inc.*, 1 B.R. 446, 450 (Bankr. D.Neb.1979).

■ Moreover, under New York law,[2] which the parties have stipulated governs the construction of the Finance Agreements (see Stipulation ¶ 5), BWIFC was not required to file a UCC–1[3] financing state-

---

**2.** N.Y. Banking Law § 566(2)(b) (McKinney 1985) provides that:

No filing of the assignment or notice thereof to the insured shall be necessary to the validity of the written assignment of a premium finance agreement as against creditors or subsequent purchasers, pledgees, or encumbrances of the assignor.

**3.** N.Y. Uniform Commercial Code § 9–104 (McKinney 1985) provides that:

This Article does not apply

(g) to a transfer of an interest or claim in or under any policy of insurance ... except as provided with respect to proceeds (Section 9–306) and priorities in proceeds (Section 9–312).

ment or take any other action to perfect its security interest.

## II.

### EFFECT OF 11 U.S.C. § 552 ON SE-CURED INTEREST IN UNEARNED INSURANCE PREMIUMS

RBS and the Official Unsecured Creditors' Committee ("committee") contend that BWIFC's security interest in unearned premiums terminated upon the filing of the petition in this case by operation of 11 U.S.C. § 552(a),[4] and that the unearned premiums, and the escrow fund substituted therefor, are after acquired property which is not subject to the "proceeds" exception under § 552(b).[5] According to their argument, there were no prepetition unearned premiums and BWIFC was merely granted the assignment of a future right to any unearned premiums that might result from the exercise of its right to cancel the policies in the event that RBS defaulted on its obligation to pay BWIFC under the Finance Agreements.

RBS and the committee rely upon *In re Duke Roofing Co., Inc., supra,* 47 B.R. 990, to support their argument that BWIFC did not have a prepetition property right in unearned premiums because the policy had not yet been cancelled. Their reliance is misplaced. Apart from the fact that *Duke Roofing* did not involve the analysis of a premium financing agreement, the district court specifically stated: "[w]ere this case to involve a premium financing agreement as described above (which was similar to the Finance Agreements here) the result might be different."

*Id.* at 994. The court went on to observe: "[h]ad the debtor expressly granted to [the lender] a security interest in unearned insurance premiums refunds, [the lender's] cause for expansion of the common law to recognize pre-cancellation perfection of such security interests would be much stronger." *Id.* at 995.

■ RBS and the committee also rely upon *Matter of Gross-Feibel Co., Inc.,* 21 B.R. 648 (Bankr.S.D.Ohio 1982), but the question before that bankruptcy court, which again did not involve a premium finance agreement, was whether unearned insurance premiums were "proceeds" within the § 552(b) exception to the statutory prohibition under § 522(a) of liens attaching to after acquired property. It does not appear that an issue was raised as to whether the unearned premiums were or were not after acquired property. If the *Gross-Feibel* court concluded that the unearned premium was after acquired property, I do not agree. Rather, I find merit in BWIFC's assertion that § 552 is inapplicable to the resolution of this matter because the unearned premiums are not after acquired property, but property that existed as of the effective date of the insurance policies.

Premium finance agreements are common commercial transactions. *In re Duke Roofing, supra,* 47 B.R. at 994. The Fifth Circuit Court of Appeals has described them as follows:

> Premium financing involves an advance by the finance company to the insurance company or its agent of the premium due for the full term of the policy. This

---

**4.** § 552(a) provides that:

Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

**5.** § 552(b) provides that:

Except as provided in section 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by

such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

advance is then repaid by the insured to the finance company in amortized monthly installments which includes an additional amount to cover financing charges. The finance company is secured in making this advance by obtaining the right to cancel the policy and receive the return premium due upon cancellation if timely repayments are not made.

*Baker & Co. v. Preferred Mutual Insurance Co.,* 569 F.2d 1347, 1348 (5th Cir. 1978). Implicit in this description is an assumption that the insured party is vested with the right to cancel the policies and receive the unearned premiums at the time the policies are funded by the financer. Thus, the unearned premiums come into existence when the policy is funded, not when the policies are cancelled. At the first moment the policy takes effect, the entire premium is unearned. On each date thereafter the unearned portion of the premium is reduced and the earned portion is proportionately increased, so that on any given date the unearned premium may be computed. *See In re Auto-Train Corp., supra,* 9 B.R. at 159.

■ It is clear that the parties to the Finance Agreement intended to grant a security interest in the unearned premiums to BWIFC and that although BWIFC, as RBS's assignee, did not have a right to receive the unearned premiums until RBS's default, BWIFC did have an existing property right, subject to that contingency, to which a security interest could and did attach. *See Premium Financing Specialists, Inc. v. Lindsey, supra,* 11 B.R. at 137, 138; *Matter of Maplewood Poultry Co., supra* at 553. The cancellation of the policies did not create the collateral. BWIFC's status under the Finance Agreements as "attorney-in-fact with full authority to, *inter alia,* cancel the policies ...", was merely the procedural device intended by the parties to provide the insurance premium financier with recourse to the collateral securing its loan. *Cf. Matter of Maplewood Poultry Co.,* 2 B.R. at 553 (finance company's power of attorney provides a contractual remedy with which it may enforce its rights in the event of default by the insured).

■ The unearned premiums do not exist in a conceptual vacuum, they are a specific fund, subject to precise calculation, with which the parties intended to secure RBS's obligation to BWIFC under the Finance Agreement. This court will not employ the Bankruptcy Code to interfere with the prepetition intent of the parties by characterizing unearned premiums as a mere promise waiting to be fulfilled. Moreover, treatment of unearned premiums so that they have no viability until cancellation of the insurance policy under which they are owed, as RBS and the committee urge, would chill this common financing mechanism and diminish the ability of financially troubled companies to obtain insurance.

### III.

#### Conclusion

For the foregoing reasons, it is Ordered that BWIFC is entitled to the funds in the escrow account established by prior order of this Court, and Judgment shall enter in favor of BWIFC.