In re ROCOR INTERNATIONAL, INC., doing business as Rocor Transportation, doing business as Consolidated Traffic Management Company, Debtor.

Rocin Liquidation Estate,
Plaintiff–Appellant,

v.

UPAC, Defendant–Appellee.

BAP No. WO–06–101.
Bankruptcy No. 02–17658–WV.
Adversary No. 04–01287–WV.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Dec. 17, 2007.

**568**

David M. Brown (Nicholas A. Franke with him on the brief) of Spencer Fane Britt & Browne, LLP, St. Louis, MO, for Plaintiff–Appellant.

Keith J. Shuttleworth of the Shuttleworth Law Firm, LLC, Overland Park, KS, for Defendant–Appellee.

Before McFEELEY, Chief Judge, THURMAN, and KARLIN [1], Bankruptcy Judges.

OPINION

KARLIN, Bankruptcy Judge.

The Appellant, Rocin Liquidation Estate ("Estate"), appeals the bankruptcy court's

September 29, 2006, order granting summary judgment in favor of Appellee, UPAC. For the following reasons, we AFFIRM the decision of the bankruptcy court.

## I. Background

The Debtor in the underlying bankruptcy case, Rocor International, Inc., was a trucking company that provided freight hauling services throughout the United States, with its main terminal located in Oklahoma City, Oklahoma. On August 5, 2002, Debtor filed a voluntary bankruptcy petition pursuant to Chapter 11 of the Bankruptcy Code.

UPAC provides insurance premium financing to businesses pursuant to a Premium Financing Agreement ("PFA"), under which it pays the financed portion of insurance premiums directly to another's insurance carrier. This is a common practice in the insurance industry, because premium financing enables a commercial enterprise to prepay its insurance premiums in full at the inception of coverage without having to immediately expend large amounts of cash for the policy. In the standard arrangement, the insured pays roughly 15% to 20% of total premiums due at the inception of the policy. The remaining balance is advanced by the premium finance company. That advance, coupled with the insured's down payment, fully prepays the insured's premiums, resulting in full coverage for any loss covered by the policy.

As collateral for the loan, the insured typically assigns to the premium finance company all unearned, "return" premiums (i.e., the premiums already received by the insurer but for which insurance protection

**1.** Honorable Janice Miller Karlin, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Kansas, sitting by designation.

has not yet been provided). Although insurance premiums are typically prepaid at the inception of coverage, the insurer "earns" its premiums on a pro rated basis, earning 1/365 of its premium for each day it extends coverage to the insured. Therefore, on the inception date of coverage, 100% of prepaid premiums are unearned by the insurance company. That balance diminishes each day as the insurer gradually earns its premiums. If the policy is canceled before the end of the term, the insurer must refund the unearned portion. The amount of the unearned portion is subject to simple calculation.

In addition to granting a security interest in its unearned premiums, the insured also typically gives the premium finance company limited power of attorney to cancel the policy in the event of default, after notice, and to take possession of its collateral—the unearned premiums. Premium finance companies require such provisions so that they do not become unsecured at any time during the period of a loan by virtue of their steadily declining collateral.[2] These provisions provide a costless and quick remedy, which is to cancel the policy and recover the rest of the debt it is owed by receipt of unearned premiums directly from the insurer.[3]

On September 11, 2001, UPAC entered into such an agreement with Debtor to finance specified insurance coverage for the twelve month term beginning July 30, 2001. The full annual premium for this insurance coverage was $275,000. In the agreement, Debtor appointed UPAC as its attorney-in-fact to cancel the financed insurance policy if Debtor defaulted in its payments to UPAC and did not cure the default within ten days.

Under the terms of the PFA, Debtor agreed to and did make a down payment in the amount of $82,500, as well as one "retained payment" of $22,277.84, to its insurer, and was required to make nine monthly payments to UPAC, each slightly more than $22,000, beginning on September 1, 2001.[4] UPAC then paid the balance of the required $275,000 annual premium to the insurer.[5] UPAC received Debtor's ninth and final payment, the payment at issue, on May 13, 2002. Since this payment was received eighty-four days prior to the date Debtor filed bankruptcy on August 5, 2002, the Estate argues that this last payment constituted a preferential transfer in violation of 11 U.S.C. § 547(b).[6]

On the date this payment was made, UPAC's records show that unearned premiums then subject to UPAC's security interest totaled $60,225; UPAC was thus oversecured by almost $38,000 on the date of the transfer. UPAC's records also show that even if the identified insurance policy had not been canceled for non-pay-

**2.** *See Schwinn Plan Comm. v. Transamerica Ins. Fin. Corp. (In re Schwinn Bicycle Co.),* 200 B.R. 980, 994 (Bankr.N.D.Ill.1996).

**3.** *Id.* at 995.

**4.** Payments under Debtor's PFA differed slightly from the "typical" payment schedule because its insurance coverage began over a month prior to execution of the PFA with UPAC. As a result, the payment period was slightly compressed. Debtor's first payment was actually received by UPAC on or about September 18, 2001.

**5.** *See Appendices A and D to UPAC's Motion for Summary Judgment, in* Appellant's Appendix at 121–22 and 129–30.

**6.** This case was filed before October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective. Thus, all statutory references to the Bankruptcy Code are to 11 U.S.C. §§ 101–1330 (2004), unless otherwise specified. All references to the Federal Rules of Bankruptcy Procedure are to Fed. R. Bankr.P. (2004), unless otherwise specified.

ment for another five weeks (to allow time for the requisite notice of default and cancellation of the policy),[7] the unearned premiums would still have exceeded the amount of the transfer by upwards of $6,000.[8] However, because the policy term expired on July 30, 2002, no unearned premiums remained when Debtor filed its petition in bankruptcy six days later.

## II. Appellate Jurisdiction

This court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[9] A decision is considered final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."[10] The bankruptcy court's entry of summary judgment was a final, appealable order for purposes of 28 U.S.C. § 158(a).[11] The Estate's notice of appeal was timely filed within ten days after entry of the order granting summary judgment to UPAC. Neither party elected to have this appeal heard by the district court for the Western District of Okla-

homa. Therefore, this Court has jurisdiction to review the order.

## III. Standard of Review

The applicable standard of review of orders granting summary judgment is *de novo*, and this Court is required to apply the same legal standard as was used by the bankruptcy court to determine whether either party is entitled to judgment as a matter of law.[12] *De novo* review requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision.[13] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[14]

## IV. Discussion

To recover the $22,277 payment from UPAC as preferential, the Estate must establish the five elements of a preference set out in § 547(b). Pursuant to that section:

**7.** Had the payment not been received, the agreement between the parties only required UPAC to give ten days notice to Debtor of the cancellation, after which time UPAC could have demanded payment of the unearned premiums directly from the insurer to protect its fully secured status.

**8.** *See UPAC's Motion for Summary Judgment* at 5, ¶ 18–23, *in* Appellant's Appendix at 118 (setting forth undisputed facts, supported by an affidavit, which facts were never disputed by the Estate with appropriate pleadings, depositions, answers to interrogatories, admissions, or an affidavit, as required by Federal Rule of Bankruptcy Procedure 7056(c) and (e)). In this appeal, the Estate does not contend there are any material facts in dispute.

**9.** 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002.

**10.** *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (internal quotation marks omitted).

**11.** *See Tanner v. Barber (In re Barber)*, 326 B.R. 463, 466 (10th Cir. BAP 2005) (holding that summary judgment order that disposed of the adversary proceeding was a final order subject to appeal under 28 U.S.C. § 158(a)(1)).

**12.** *Tillman ex rel. Estate of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1303 (10th Cir. 2005).

**13.** *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

**14.** Fed.R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

... [t]he trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

 (A) on or within 90 days before the date of the filing of the petition; or

 (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

 (A) the case were a case under chapter 7 of this title;

 (B) the transfer had not been made; and

 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.[15]

In other words, the five elements of a voidable preference are that it (1) benefits a creditor; (2) be on account of antecedent debt; (3) be made while the debtor was insolvent; (4) be made within 90 days, or one year if the transferee is an insider, before bankruptcy; and (5) enables the creditor to receive a larger share of the estate than if the transfer had not been made.[16]

Only the last element is at issue in this case—whether UPAC received more than it would have received under a hypothetical Chapter 7 liquidation, had the alleged preferential transfer not been made. Section 547(g) clearly provides that the Estate bears the burden of proving the avoidability of a transfer under § 547(b).[17]

Whether a creditor has received a preferential payment is determined, at least in part, "on the nature and extent of that creditor's claim."[18] A payment to a wholly unsecured creditor may be preferential, assuming all the other elements of § 547(b) are met, if the amount of the payment exceeds what that creditor would have received as its pro rata share along with the other unsecured creditors upon liquidation of the Chapter 7 estate.[19] Conversely, a fully secured creditor is usually not subject to a preference claim because secured creditors receive 100% of the value of their collateral upon distribution in a Chapter 7 case.[20]

The seminal case analyzing preferential payments under § 547(b)(5) is *Palmer Clay Products Co. v. Brown*.[21] In *Palmer*,

---

15. 11 U.S.C. § 547(b).

16. *In re Mama D'Angelo, Inc.*, 55 F.3d 552, 554 (10th Cir.1995).

17. 11 U.S.C. § 547(g) ("... the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section ..."). *See also In re Robinson Bros. Drilling, Inc.*, 6 F.3d 701, 703 (10th Cir.1993) (trustee has burden of proving by preponderance of the evidence every essential, controverted element resulting in the preference).

18. *Schwinn Plan Comm. v. Transamerica Ins. Fin. Corp. (In re Schwinn Bicycle Co.)*, 200 B.R. 980, 987 (Bankr.N.D.Ill.1996) (internal quotation marks omitted).

19. *Id.* at 987.

20. *Id.* at 988. *See also In re Castletons, Inc.*, 990 F.2d 551, 554 (10th Cir.1993) (quoting *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1936) and [5] *Collier on Bankruptcy* ¶ 547.0[3], at 547–43 (Lawrence P. King ed., 15th ed.1993)).

21. 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936).

the United States Supreme Court generally held:

> [w]hether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.[22]

At first blush, *Palmer* appears to settle the legal issue in this case in favor of the Estate, and would require the Court to look solely at the date the petition was filed when determining all issues involved with the alleged preferential transfer.

As the bankruptcy court correctly noted, however, *Palmer* is distinguishable because the payments therein held to be preferential were made on unsecured claims. Courts have often taken a different approach when dealing with claims that are either fully or partially secured.[23] In cases specifically dealing with insurance premium financing agreements, two approaches have arisen.

The first approach is set forth in *Gray v. A.I. Credit Corp. (In re Paris Industries Corp.).*[24] In *Paris*, the trustee brought a preference action against an insurance premium financier. The finance company,

like UPAC in this case, argued that it was fully secured on the date of the payment, and that the trustee could thus not prove the hypothetical Chapter 7 liquidation test required by § 547(b)(5). As is true here, the financing company in *Paris* was fully secured by the unearned premiums on the date of the transfer, and only lost its secured status during the following 90 days due to the diminishing amount of the unearned premiums securing its loan.

The *Paris* court rejected the finance company's argument and valued the collateral at the date of the bankruptcy filing. As of that date, the premiums had been fully earned, and therefore no collateral remained to secure its then retired debt once owed to the finance company. The court held that because the defendant was not still fully secured on the date of the bankruptcy filing, the creditor received more than it would have received in a hypothetical Chapter 7 filing, and the elements of § 547(b)(5) were satisfied.

In conducting this analysis, the court used the "add-back" method to determine that the creditor was undersecured—that is, the payments made by the debtor were "added back" to the outstanding debt on the petition date (zero) and then compared to the amount of collateral remaining securing the claim, also on the petition date

---

**22.** *Id.* at 229, 56 S.Ct. 450.

**23.** *See, e.g., Zimmerman v. Commonwealth of Pa. (In re Rimmer Corp.),* 80 B.R. 337, 339 (Bankr.E.D.Pa.1987) (holding payment made to secured claimant, the priority of whose security extends to at least the amount of the payment made, is not preferential); *Gilbert v. Gem City Sav. Ass'n (In re Hale),* 15 B.R. 565, 567 (Bankr.S.D.Ohio 1981) (holding receipt of $1,079 payment on mortgage, where equity in real property collateral exceeded $13,000 on date of payment, was not a preference); *Trimble v. McCoy Bros., Ltd. (In re Hawkins Mfg., Inc.),* 11 B.R. 512, 513–514 (Bankr. D.Colo.1981) (explaining that "to the extent a secured creditor holding valuable collateral

receives payment prior to bankruptcy, the amount of the secured claim is proportionately reduced. The 'net' effect of the payments on the size of the fund available to satisfy the claims of general unsecured creditors is zero."); and *Mazer v. Aetna Fin. Co. (In re Zuni),* 6 B.R. 449, 451 (Bankr.D.N.M.1980) (holding that because fair market value of collateral continued to exceed amount of debt after payment of three installment payments during preference period, resulting in no depletion of the debtor's estate, payments were not a preference).

**24.** 130 B.R. 1 (Bankr.D.Me.1991).

(zero, because by then the policy had terminated, and all premiums had been earned). According to *Paris*, "the date of the petition is controlling" regarding all aspects of the analysis.[25]

A decidedly different approach was taken by the bankruptcy court in *Schwinn Plan Committee v. Transamerica Insurance Finance Corp. (In re Schwinn Bicycle Co.)*[26] In *Schwinn,* the court specifically rejected the application of the "add-back" method in cases involving insurance premium financing, and instead looked to the date of the transfer to determine the creditor's status as secured, undersecured, or unsecured. The *Schwinn* court followed the two step analysis previously adopted by the Court of Appeals for the Seventh Circuit in *In re Prescott,*[27] for determining whether a preference had taken place under facts similar to those in this case.

■ The first step of the analysis is to determine the actual secured status of the creditor immediately prior to the alleged preferential transfer: "[i]f a creditor is fully secured, then it follows that a payment to that creditor merely reduces the secured claim, and releases from the security interest the same amount of collateral. Hence, if the creditor is fully secured prior to payment, it cannot be preferenced in having received the payment."[28]

The second step is to determine whether the payment was accompanied by the release of an equivalent value of collateral.[29] If the payment to the creditor results in a release of an equivalent value of collateral, then the newly released value would theoretically be made available to the rest of the bankruptcy estate.[30] Under such circumstances, there is no diminution to the estate by the payment, and the secured creditor did not receive anything more than it would have received had the payment not been made.[31]

25. *Id.* at 3.

26. 200 B.R. 980 (Bankr.N.D.Ill.1996). *Schwinn's* analysis has been followed in *In re Teligent, Inc.,* 337 B.R. 39 (Bankr.S.D.N.Y. 2005) (holding in favor of insurance premium financer in trustee's preference claim because financer held a perfected security interest in the unearned premiums at the time of each payment, and was thus oversecured on the dates of each payment within the preference period).

27. 805 F.2d 719, 726 (7th Cir.1986) (holding that "[i]n order to meet this burden [regarding fifth element of preference], the trustee generally must establish that the preferred party's claim is not fully secured. The payment of a secured claim ordinarily does not allow a creditor to receive more than it would receive in a Chapter 7 distribution.").

28. *Schwinn,* 200 B.R. at 991.

29. *Id.* at 992.

30. As noted by the bankruptcy court, "[t]his situation should be distinguished from those instances in which unencumbered estate as-sets are used to pay an unsecured claim or the unsecured portion of an undersecured claim because those assets could otherwise have been used to pay other unsecured creditors." *Order on Motion for Summary Judgment* at 13, in Appellant's Appendix at 13.

31. Assume a debtor owned a $20,000 nonexempt boat, subject to a security interest by Creditor XYZ. If the debtor paid off the remaining $1,000 due on the note in full within 90 days of filing for bankruptcy protection, and the creditor released its lien upon receiving such payment, under the Estate's theory here, the creditor would be unsecured on the date debtor filed bankruptcy, and would have to repay that $1,000. But by releasing its lien against the boat, the creditor has released value to the estate that is equivalent to the value of the payment it received. The trustee will be able to recover the entirety of the nonexempt asset, or $20,000, because the $1,000 paid by debtor was replaced with $1,000 of collateral value. The estate is thus not harmed by the transfer. *See In re Castletons, Inc.,* 990 F.2d at 554–55 (holding that one of two key issues a court must consider is whether the remaining creditors were ad-

After considering these two approaches, this Court agrees with the bankruptcy court that the approach taken in *Schwinn* is the appropriate method for analyzing preference actions in cases involving insurance premium financing. This method does not betray the plain language of § 547 and also supports the policies behind prevention of preferential transfers.

█ The purpose of preventing preferential transfers through § 547 is well established in the legislative history of that section:

> The purpose of the preference section is twofold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a snort period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others *of his class* is required to disgorge so that all may share equally. The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section— that of equality of distribution.[32]

These policies are served by adoption of the *Schwinn* analysis, for several reasons.

First, the payment in question was a regularly occurring payment, contracted for well in advance of the bankruptcy filing, and provided a necessary service for Debtor by allowing it to maintain insurance coverage.[33] As the bankruptcy court noted in *Borg–Warner Credit Corp. v. RBS Industries, Inc. (In re RBS Industries, Inc.)*, these "unearned premiums do not exist in a conceptual vacuum, they are a specific fund, subject to precise calculation."[34] The Court agrees with the concern expressed in *In re RBS Industries, Inc.*, that an alternative holding would "chill this common financing mechanism and diminish the ability of financially troubled companies to obtain insurance."[35]

Second, disallowing these payments as preferential would in no way further the policy of preventing a race to the courthouse. In fact, such a decision would likely serve to create the race. The Estate's position—that the creditor's status on the date of filing controls even when the payment during the preference period is made at a time when the creditor is admittedly oversecured—would induce premium insurance finance companies to file involuntary petitions against the insured immediately before the value of the unearned premiums equaled the amount remaining due under the insurance agreement. They would have no other way to protect themselves.

Under the Estate's argument, the premium financing company would then be

---

versely affected as a consequence of the transfer). UPAC's situation is even more clean, because by definition, its collateral can be precisely valued on any given day.

**32.** *Schwinn,* 200 B.R. at 993 (quoting H.R.Rep. No. 95–595, at 177–78, *reprinted in* 1978 U.S.C.C.A.N. 5787, 6138) (emphasis added).

**33.** *Id.*

**34.** 67 B.R. 946, 951 (Bankr.D.Conn.1986).

**35.** *Id.*

deemed fully secured on the date of filing, and would be protected. This obviously defeats the goal of preventing a race to the courthouse, and results in no advantage to unsecured creditors.

Third, disallowing the payment as preferential would similarly thwart the policy of equal distribution among similarly situated creditors. UPAC was an oversecured creditor upon the date it received each payment under the PFA. The *Schwinn* approach simply maintains the premium finance company's fully secured status and treats the financing creditor similarly to all other fully secured creditors.

 *Schwinn* identifies two additional reasons that support its decision, both of which are persuasive. First, the payment to the premium finance company did not deplete the estate of value, because simultaneously with receipt of the payment, the company released collateral worth more than the amount of the payment. Although not expressly provided for in the Code, diminution of the estate is generally considered a requirement for finding the existence of a preference.[36] When the

payment is made to the creditor, and the creditor releases collateral in an equal amount, the net available for unsecured creditors remains the same.[37] In addition, here the Estate was provided with the value of the continuing insurance coverage for the remainder of the term of the policy, which expired only six days prior to the bankruptcy filing.

Second, to find in favor of the bankruptcy estate would have created a windfall for the estate and the unsecured creditors to the detriment of the premium finance company. The estate would receive the benefit of the financier's collateral, the insurance coverage, and also reap the reward of recovering that coverage payment for distribution to the unsecured creditors. That insurance coverage could potentially be of great value to the estate if any loss claims were made against the debtor for incidents occurring between the date of the alleged preferential payment and the filing of the bankruptcy. Such a windfall would not advance the purposes of § 547.[38] This is likely why this Court could find no decision that has followed the *Paris* analysis when dealing with fully secured or oversecured premium financing transactions.[39]

---

**36.** *See, e.g., In re Smith*, 966 F.2d 1527, 1535 (7th Cir.1992) (noting that even when all of § 547(b)'s formal requirements have been met, "courts have also long held that to be avoidable, transfers must result in a depletion or diminution of the debtor's estate"); *In re Castletons, Inc.*, 990 F.2d 551, 555 (10th Cir. 1993).

**37.** For example, in the case currently before the Court, when UPAC received the payment of $22,277, it released its right to claim that same amount of unearned premiums, which was then immediately available to unsecured creditors in place of the $22,277 in cash that was provided to UPAC. *See also In re RBS Indus.*, 67 B.R. at 951 (Noting that it is simple, in the premium financing context, to determine the value of the collateral on the date of payment because on each day after the agreement is effectuated, the unearned por-

tion of the premium is reduced, and the earned portion is proportionately increased, "so that on any given date the unearned premium may be computed.").

**38.** *Cf. In re Double Eagle Constr., Inc.*, 188 B.R. 406 (Bankr.W.D.Mo.1995) and *TIFCO, Inc. v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.)*, 67 B.R. 990 (Bankr. D.Conn.1986) (both holding that insurance premium financier was entitled to adequate protection of its security interest because the debtor's interest in unearned premiums was by its very nature depreciating in value). Thus, had Rocor filed bankruptcy six months earlier, UPAC would clearly have been entitled to adequate protection equal to the remaining balance due it. The Court can see no reason why the timing of the bankruptcy should change the analysis.

Having determined that it should follow the *Schwinn* analysis when dealing with insurance premium financing, the Court now turns to the facts of this particular case to determine whether a preference has been shown. The evidence clearly shows that UPAC's collateral (the unearned insurance premiums) was worth in excess of $60,000 on the date that Debtor paid UPAC the remaining $22,277 balance due on the financed insurance premiums. Therefore, UPAC was an oversecured creditor immediately prior to the payment in question.

In addition, once UPAC received the $22,277 final payment, UPAC obviously retained no claim to any of the collateral securing its claim—the $60,000 in remaining unearned premiums. When UPAC released its interest in those unearned premiums upon receipt of the balance due, that collateral was immediately available to Debtor's unsecured creditors (as well as the remaining insurance coverage). With UPAC having met both tests under the *Schwinn* analysis, the payment in question was not a preference under § 547 and the bankruptcy court's order should be affirmed.

The Estate argues that adoption of the *Schwinn* analysis violates Tenth Circuit precedent found in *In re Castletons, Inc.*[40] Because the facts of that case are not directly on point, however, it is not determinative. In *Castletons*, the Court of Appeals for the Tenth Circuit repeated the oft-stated proposition that "payments to a *fully secured* creditor will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation."[41] However, this proposition is not at issue in the present case. Instead, the determinative issue here is at what *time* a secured creditor's status, as either a fully secured or undersecured creditor, should be assessed.

The *Castletons* court stated that "[t]he focus of § 547(b)(5) is the status of the *bankruptcy estate* at the time of the filing of the petition."[42] According to the Estate, "[t]he *Castletons* defendant was undersecured on the transfer dates and fully secured on the petition date, because the defendant's collateral increased in value prior to the petition date."[43] Therefore, the Estate argues that *Castletons* stands for the proposition that a creditor's status is determined on the date the petition was filed rather than on the date of the alleged preferential transfer.[44]

This stretches the *Castletons* decision too far. Instead, the Tenth Circuit specifically noted that, although the trustee argued the defendant was undersecured dur-

---

39. *See, e.g., Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs., Inc. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 206 n. 13 (Bankr.S.D.N.Y. 2005) (citing *In re Paris Indust. Corp.*, 130 B.R. 1, 4–5 (Bankr.D.Me.1991) for the non-premium financing facts of its case; while also citing *Schwinn Plan Comm. v. Transamerica Ins. Fin. Corp. (In re Schwinn Bicycle Co.)*, 200 B.R. 980 (Bankr.N.D.Ill.1996) in holding that "[t]he result would be different if the finance company had been fully secured").

40. 990 F.2d 551 (10th Cir.1993).

41. *Id.* at 554 (emphasis added) (internal quotation marks omitted).

42. *Id.* (emphasis added).

43. Appellant's Reply Br. at 6.

44. *Id.*

ing the alleged preferential transfers, "the bankruptcy court refused to make such a finding." [45] Moreover, although the value of the defendant's collateral did increase during this period, the court found that fact to be "irrelevant" because, even if this technically improved the defendant's position, it did not adversely affect any unsecured creditors as the defendant had a blanket, floating lien on all of the estate's potential assets.[46] Thus, "[w]hile the identity of individual items of collateral changed because of sales and subsequent acquisitions of new collateral, the overall nature of [defendant's] security interest remained the same"—that "nature" being as a fully secured claim.[47]

The *Castletons* court did not specifically state the date upon which the status of a creditor (as fully secured or undersecured) should be determined because that was not at issue in the case. Instead, the case merely supports the proposition that the actual hypothetical Chapter 7 liquidation test must be performed on the petition date. Because the *Castletons* court did not specifically deal with the issue of when to determine a secured creditor's status, and because it expressly noted that the remaining creditors therein were not adversely affected as a consequence of the transfers, we conclude that *Castletons* does not mandate rejection of the *Schwinn* analysis in the insurance premium financing context.

## V. Conclusion

Based on the foregoing analysis, the bankruptcy court did not err in granting summary judgment in favor of UPAC on the Estate's preference action. According-

ly, we AFFIRM the decision of the bankruptcy court.

---

**45.** *Castletons,* 990 F.2d at 554.

**46.** *Id.* at 556.

